1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

7

8    HUNG DANG, M.D.,

9                                    Plaintiff,

        v.

10   KIMBERLY MOORE, M.D., et al

11

12                            Defendant(s).

CASE NO. 3:21-cv-05544-RJB
[to be filled in by Clerk's Office]

COMPLAINT FOR VIOLATION
OF CIVIL RIGHTS AND
EMPLOYMENT
DISCRIMINATION

Jury Trial: ☒ Yes   ☐ No

13              **I.    THE PARTIES TO THIS COMPLAINT**

14   Plaintiff

15        | Name | HUNG DANG, M.D. |

16        | Street Address | 27222 10TH AVE S |

         | City and County | DES MOINES, KING COUNTY |

17        | State and Zip Code | WA 98198 |

18        | Telephone Number | |

19   Defendants

20        Defendant No. 1

21            | Name | KIMBERLY MOORE, M.D. |

22            | Job or Title (*if known*) | |

             | Street Address | 8414 SE 39TH ST |

23            | City and County | MERCER ISLAND, KING COUNTY |

             | State and Zip Code | WA 98040 |

24

Telephone Number _____

☒ Individual capacity    ☐ Official capacity

Defendant No. 2

Name                              MARK ADAMS, M.D.

Job or Title *(if known)*         Former Chief Medical Officer for FHS

Street Address                    2500 Grant Rd

City and County                   MOUNTAIN VIEW, SANTA CLARA

State and Zip Code                CA 94040-4302

Telephone Number

☒ Individual capacity    ☐ Official capacity

Defendant No. 3

Name                              KETUL PATEL

Job or Title *(if known)*         Chief Executive Officer for FHS

Street Address                    1515 Dock St UNIT 613

City and County                   TACOMA, PIERCE

State and Zip Code                WA 98402

Telephone Number

☒ Individual capacity    ☐ Official capacity

Defendant No. 4

Name                              FRANCISCAN HEALTH SYSTEM

Job or Title *(if known)*         A healthcare public benefit nonprofit corporation

Street Address                    711 CAPITOL WAY S, STE 204,

City and County                   OLYMPIA, THURSTON

State and Zip Code                WA 98501-1267

Telephone Number

☒ Individual capacity    ☐ Official capacity

Defendant No. 5

Name                              ANN CLARK

1

2

3

4

5

| | |
|---|---|
| Job or Title *(if known)* | |
| Street Address | 1807 150th St S |
| City and County | SPANAWAY, PIERCE |
| State and Zip Code | WA 98387 |
| Telephone Number | |
| ☒ Individual capacity | ☐ Official capacity |

Defendant No. 6

6

7

8

9

10

11

| | |
|---|---|
| Name | MARK JOHNSON |
| Job or Title *(if known)* | MQAC member |
| Street Address | 402 S 9th St |
| City and County | MOUNT VERNON, SKAGIT |
| State and Zip Code | WA 98274 |
| Telephone Number | |
| ☒ Individual capacity | ☒ Official capacity |

Defendant No. 7

12

13

14

15

16

17

| | |
|---|---|
| Name | WILLIAM M. BRUEGGEMANN |
| Job or Title *(if known)* | MQAC member |
| Street Address | 40 Brown Ln S |
| City and County | SELAH, YAKIMA |
| State and Zip Code | WA 98942 |
| Telephone Number | |
| ☒ Individual capacity | ☐ Official capacity |

Defendant No. 8

18

19

20

21

22

23

| | |
|---|---|
| Name | RICK J. GLEIN |
| Job or Title *(if known)* | MQAC staff attorney |
| Street Address | 5417 Kirkwood Place N |
| City and County | SEATTLE, KING |
| State and Zip Code | WA 98103 |
| Telephone Number | |
| ☒ Individual capacity | ☐ Official capacity |

Defendant No. 9

24

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND EMPLOYMENT DISCRIMINATION - 3

1

| Name | ROMAN S. DIXON Jr. |
|---|---|
| Job or Title *(if known)* | Administrative health law judge |
| Street Address | 1624 S Cushman Ave |
| City and County | TACOMA, PIERCE |
| State and Zip Code | WA 98405 |
| Telephone Number | |
| ☒ Individual capacity | ☐ Official capacity |

2

3

4

5

Defendant No. 10

6

7

| Name | DEBRA L. DEFREYN |
|---|---|
| Job or Title *(if known)* | Assistant Attorney General |
| Street Address | 8929 Windham Ct NE |
| City and County | LACEY, THURSTON |
| State and Zip Code | WA 98516 |
| Telephone Number | |
| ☒ Individual capacity | ☐ Official capacity |

8

9

10

11

12

Defendant No. 11

13

| Name | CHRISTINA PFLUGER |
|---|---|
| Job or Title *(if known)* | Assistant Attorney General |
| Street Address | 2842 Coventry Ln Sw Apt 2815 |
| City and County | TUMWATER, THURSTON |
| State and Zip Code | WA 98512 |
| Telephone Number | |
| ☒ Individual capacity | ☐ Official capacity |

14

15

16

17

18

Defendant No. 12

19

| Name | TIMOTHY H. SLAVIN |
|---|---|
| Job or Title *(if known)* | MQAC Investigator |
| Street Address | 14627 Knowles Rd SE |
| City and County | TENINO, THURSTON |
| State and Zip Code | WA 98589 |
| Telephone Number | |
| ☒ Individual capacity | ☐ Official capacity |

20

21

22

23

24

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND EMPLOYMENT DISCRIMINATION - 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## II.    NATURE OF THE CASE

1.    This is an action for damages and injunctive and declaratory relief pursuant to 42 U.S.C. § 1983 based upon the continuing violations of Plaintiff's rights under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, Washington State Civil Rights Act RCW 49.60.030, Washington State Administrative Procedure Act RCW 34.05, and Washington State Uniform Disciplinary Act RCW 180.130.

2.    This is also an employment discrimination case, brought pursuant to the provisions of the Civil Rights Act of 1866, 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991 ("Section 1981"), Consumer Protection Act RCW 19.86 and Washington State Civil Rights Act RCW 49.60.030.

3.    Additionally, because the private defendants acted in concert with the state defendants in furtherance of a conspiracy to deprive Plaintiff of equal privileges and immunities under the US Constitution and 42 U.S.C. §1981, this action also is for damages and injunctive and declaratory relief pursuant to 42 U.S.C. § 1985 and RCW 19.86 whereby Plaintiff's medical license and professional standing and reputation in Washington and Oklahoma states are severely damaged and Plaintiff's rights and privileges of a citizen of the United States deprived.

## III.    JURISDICTION AND VENUE

4.    Original Jurisdiction of this Court exists pursuant to 28 U.S.C. § 1331 and 1343 based on 42 U.S.C. §1983, 1981, and 1985(3) and questions of federal constitutional law. Jurisdiction also exists under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and

2202. Supplemental jurisdiction over Plaintiffs' state law claims is pursuant to 28 U.S.C. §1367.

5.    Venue is proper in the Western District of Washington State in Tacoma in that the events and conduct complained of herein all occurred in Pierce and Thurston Counties of the Western District.

### IV.    STATEMENT OF THE CASE

6.    Plaintiff alleges that as a result of being an immigrant Asian American and engaging in protected speech and expression, I was illegally harassed, subjected to a pattern of unwelcome racial discrimination, and knowingly subjected to unjustified and factually unsupported disciplinary actions by both private Defendants and state Defendants in a series of concerted action or conspiracy designed to improperly retaliate my speech and expression and deprive me of due process, equal protection under the law, and privacy against intrusions by MQAC officials guaranteed by the US Constitution as well as the right to make and enforce my employment contract according to 42 U.S.C. § 1981. Plaintiff also alleges that but for my race, I would not have lost my job and suffered from grave injuries to my professional reputation and livelihood.

7.    I was born and raised in Vietnam but fled its oppressive communist regime for the USA with my family in 1992 as a political refugee at the age of 20 to realize my dream of becoming a physician and a naturalized US citizen. After overcoming many seemingly insurmountable obstacles, I graduated *summa cum laude* from the University of Oklahoma College of Pharmacy in 1998 and then with honors from the University of Oklahoma College of Medicine in 2003. I finished my otolaryngology training in Oklahoma in 2008 and accepted a staff otolaryngologist position with Group Health Permanente (GHP) Otolaryngology practice in Tacoma, WA. I got my license to practice

medicine in WA state in August 2008 and then my Board of Otolaryngology certification in 2010. Up to the time of my adjudicative proceeding, I had never had any federal or state law violation or disciplinary action of any type. The Final Order clearly stated "no prior discipline" as one of the mitigating factors in its Conclusion of Law (COL) 2.12. Neither have I ever been sued or settled for medical negligence or malpractice.

8.   My "confidential" employment contract with GHP dated June 11th, 2008 reads, "As a condition of initial and continued employment, Practitioner has obtained (or shall obtain before the Employment Commencement Date) and shall maintain at all times during his employment with GHP:

> 6.1 A full and unrestricted license to perform the professional duties of the
>     position … in the State of Washington;
>
>         …
>
> 6.4 Credentials …, and clinical privileges at all non-GHC facility(ies) at which
>     GHP requires Practitioner to maintain clinical privileges."

9.   Founded in 1947, Group Health Cooperative (GHC) was a consumer-governed, nonprofit health care system that coordinates care and coverage. Based in Seattle, Group Health and its subsidiary health carriers, Group Health Options, Inc. and KPS Health Plans, served more than half a million residents of Washington state and Idaho before it was acquired by Kaiser Permanente on February 1st, 2017. GHP is the medical group contracted to provide medical services to GHC member. Subsequently, GHP changed its name to Washington Permanente Medical Group (WPMG).

10.  At all times relevant herein, GHC did not operate any local hospital and thus contracted with the Franciscan Health System (FHS) as its provider of acute-care hospital services for Group Health members in the South Sound since 1996. To date, most admissions of

Group Health enrollees for inpatient care in the South Sound region have occurred at St.

Joseph Medical Center (SJMC), the flagship hospital of FHS in Tacoma.

11. GHP Otolaryngology Practice/Group in Tacoma included three otolaryngologists

employed by GHP to serve GHC members at the Group Health Tacoma Specialty Center.

I was employed in September 2008 and thus was the most senior member of the group.

Dr. Moreano was employed in May 2011 while Dr. Deem started in October 2012. Drs.

Moreano and Deems are neither Asian nor immigrant.

12. Defendant Franciscan Health System (FHS) was at all times relevant herein a

Washington professional services 501(c)(3) corporation with its principal place of

business in Tacoma, Pierce County, Washington. Nevertheless, Defendant FHS was and

is jointly and severally liable for the errors and omissions of its employees, directors,

officers, and agents as respondeat superior per RCW 18.100.070.

13. The FHS was registered and incorporated in Washington State and owns multiple

hospitals throughout the Puget Sound area. Each of these hospitals is an independent

entity and has its own Medicare provider number.

14. Since GHC did not operate any local hospital, I was required to obtain and maintain staff

membership at St Joseph Medical Center (SJMC), the flagship hospital of the FHS. *See*

¶8. I have never agreed to be a representative or agent for any hospital within the FHS,

including SJMC. Neither have I been employed by SJMC or FHS.

15. In exchange for this medical staff membership at SJMC, I agreed to take emergency ENT

calls *only* for *unassigned* patients at the Emergency Department (ED) of SJMC campus

on a regular basis *without* any financial compensation. I <u>*never*</u> agreed to cover all ED

patients for the entire FHS. This is consistent with the FHS Medical Staff Bylaws and its

Rules and Regulations (Article II Section 1C and Section 10, respectively).

16. At all times relevant to this matter, the FHS owned the Franciscan Ear, Nose & Throat Associates (FHS ENT practice/group) and employed many otolaryngologists, who contractually had to take calls for the entire health system. Dr. Souliere was the chief of this FHS ENT practice. At all times relevant herein, there was always a Franciscan otolaryngologist (FHS ENT) on call contemporaneously and simultaneously whenever I or any other GHP ENT physician was on community call because we never agreed to cover for any patient of their practice. Likewise, the FHS otolaryngologists did not have to cross-cover for GHP Otolaryngology practice.

17. FHS Medical Staff Bylaws Article II, Section 1.A.6 states, "All practitioners shall reside and practice in sufficient proximity to the Campus to insure that any patient under the care and supervision of such practitioner will receive continuous care consistent with their expected needs, especially in the case of emergencies." Due to this requirement, GHP Otolaryngology practice and Franciscan Ear, Nose & Throat Associates did not cross-cover for their respective practice patients, especially in cases of emergencies.

18. Soon after my employment and in spite of these formal rules and verbal agreements, I started getting calls from the ED's of other outlying Franciscan hospitals in the Puget Sound area, including St Francis hospital (SFH) in Federal Way, St Clare hospital (SCH) in Lakewood, St Anthony hospital (SAH) in Gig Harbor, St Elizabeth hospital (SEH) in Enumclaw, and then later Harrison Medical Center in Bremerton. Sometimes, my GHP practice partners and I even got calls about patients belonging to the Franciscan Ear, Nose & Throat Associates. On multiple occasions over several years, my GHP ENT partners and I have raised issues about the burden of covering multiple ED's within the ever-expanding Franciscan Health System with the FHS administration as well as my

1    employer, Group Health Permanente. We had to repeatedly tell these other hospitals that

2    GHP ENT group was not on call for them and that the FHS ENT group was.

3    19.    While all GHP ENT physicians routinely refused to consult on patients of outlying

4    Emergency Departments of the FHS, I was singled out for harassment and retaliation for

5    expressing my opinion regarding community call and for refusing to consult on patients

6    with whom I had no professional relationship and thus duty of care. I was harassed by

7    multiple "incident reports" for my vocal opinion about the FHS's abusive conduct.

8    20.    On September 29th, 2011 an "incident report" alleged that I refused to consult on a patient

9    with a neck abscess at the ED of St Clare Hospital, where I did not practice or apply for

10    medical staff membership. Thus, I and GHP administrators emailed Dr. Tony Haftel, the

11    FHS Vice President (VP) for Quality and Associate Chief Medical Officer (ACMO), to

12    clarify this issue. In his reply on October 5th, 2011, he stated, "Dr. Dang is very correct.

13    When your (ENT) is on call it is for SJ ER only. The SCH ER has been hanging the FHS

14    call schedule for ENT on their wall, which clearly identifies that 'GH' when on call, is on

15    call for SJ ER only." He then reiterated, "We have now made it clear to our EDs that

16    when you or any other GH ENT doc is on call, they are as the schedule states on call for

17    the SJH ER." Defendant Moore was also included in this email thread.

18    21.    Because of this same "incident report," Dr. Charles Souliere, the chief of the Franciscan

19    Ear, Nose & Throat Associates, clarified in his email dated October 9th, 2011,

20        "FMG [Franciscan Medical Group] ENT docs are, in effect, required to cover all
         FHS hospitals, even though we do not work at SFH, SCH, or SEH (while there
21        are private ENT practioners [sic] at these hospitals who take no ED call).  We
         have no choice as we are FHS employees.  Group Health ENT docs, however, are
22        not FHS employees, and should not be held to the same
         requirements.  Traditionally, community call is taken only at hospitals in which
23        one practices, and this is a reasonable expectation for the Group Health
         docs.  Since these docs only practice at St Joes, any call coverage they provide to
24        other FHS hospitals would seem to be voluntary."

22.    This incident report revealed the unsolved issues with ENT coverage for the FHS ED's.

Even the former Chief Medical Officer (CMO), Dr.  Gregory G. Semerdjian, admitted as

such in his October 10, 2011 email and promised a solution,

> "Colleagues,
> First of all I want to thank you all for the great support you have
> given to FHS over the years.  We are trying to sort through this issue
> of call and want to assure you that we take this responsibility very
> seriously.  We are conducting data gathering as of this writing and will
> get back with everyone as soon as this is complete, hopefully before the
> end of this week.  I apologize for all the email traffic on this call
> issue but it has uncovered some flaws that we need to deal with.  Thank you for
> your patience."

23.    For many years, my GHP ENT practice partners and I had tried to address the burden of

calls with FHS administrators, who were well aware of the issues but took no definitive

action. We repeatedly reiterated that GHP ENT physicians were only on call for the ED

at SJMC and *not* for all ED's within its vast health system. Defendant Moore, as one of

the FHS administrative officers, was well aware of this agreement and all its related ENT

call coverage issues.

24.    The FHS administrators including Defendants Moore and Adams were well aware of my

stance that any request to transfer patients to SJMC had to go through the Franciscan

Patient Placement center to be accepted when appropriate.

25.    I became the Chief of the Tacoma ENT group in August 2012, when Dr. Elonka retired.

26.    As the Chief, I was vocal about the issues arising from the community call burden, which

were not addressed in any meaningful manner by the FHS administrators. Thus, the FHS

administration engaged in a relentless campaign to single me out for retaliation of my

vocal advocacy and opinion about the safety and adequacy of their ENT call coverage.

27.    When the increasing burden of FHS ED calls started to disrupt our own practice and

livelihood, my partners and I, with the support of GHP administrators, decided to strictly

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND EMPLOYMENT DISCRIMINATION - 11

limit our call coverage to just SJMC. We informed the FHS administration including Defendant Moore around April of 2014 that the FHS-employed ENT group should cover for the rest of the FHS since they were on call simultaneously.

28. In February of 2014, I fractured my upper left arm but fortunately did not need surgery for it. While my left arm healed, I had significant limitations in its range of motion from this injury. Soon after this injury, I avulsed my right Achilles tendon and had to undergo surgical repair at the end of February 2014. After surgery, I was immobilized in a cast for 4 weeks and was placed on non-weight bearing restrictions until the middle of June of 2014. For rehabilitation and physical therapy, I was allowed to only walk or run in a pool. I managed to work instead of taking an extended medical leave to rehabilitate these 2 orthopedic injuries. I had to limit my surgical caseloads due to my decreased mobility and leg strength. Still, I continued to take ENT calls for SJMC.

29. In April of 2014, the flurries of community calls caused a lot of disruption to our entire group practice. We received multiple calls to take care of patients who turned out to be the Franciscan ENT patients. I, on at least one occasion, had to cancel my scheduled afternoon clinic to attend to a patient with nosebleed, who turned out to be a Franciscan ENT patient. The GHP otolaryngologists became more and more vocal about the undue burden of community calls and continued to collectively refuse to consults on FHS patients at other outlying FHS facilities. Our firm stance on limiting community call coverage to just SJMC only finally got the attention of the FHS because the FHS administrators asked Dr. Iriye to meet about the problems arising from community call. This request started another serious discussion amongst the GHP ENT physicians and GHP administrators. We again came to a consensus that the FHS Bylaws and Rules and Regulations did not require us to take calls for the entire health system. My partners and I

made it crystal clear about our entire group's stance on this. Defendant Moore, the Associate Chief Medical Officer of the FHS was aware of our stance on community call, which is to limit our on-call coverage to just SJMC and not the entire FHS.

30.    Defendant Moore subsequently met with our medical center chief, Dr. Iriye, to convince us to provide coverage all ED's of the entire health system until the FHS can find a more permanent solution to call coverage issues. We respectfully rejected that suggestion because the FHS administrators had been unwilling to solve their inadequate ENT coverage for many years. They had no incentive to solve this issue because they did not want to pay for additional ENT coverage at other outlying hospitals.

31.    On Sunday June 8th, 2014 around 4 PM I slipped and fell getting out of the pool at my local gym after my physical therapy. My orthopedic injuries got aggravated and caused severe pain. All I could think about was to take some pain medication and lie down to rest. While trying to use my crutches to get to my bedroom upstairs, I realized I could barely lift my left arm to shoulder level without pain. So, I took one tablet of my prescribed pain medication as well as ibuprofen to help ease the pain in my arm and leg. I lay down to rest in my bed when my pager went off. I telephoned the ED at St Clare Hospital (SCH) in a timely manner after receiving the page.

a.    Ms. Allen, a physician assistant working at the ED at SCH, asked me to evaluate her stable patient with tonsillar abscess. I informed her that I was not on call at SCH and that she should contact the FHS-employed ENT physician on call. When she offered to transfer the patient to SJMC, I explicitly declined because I did not have the physical capacity to care for that patient due to my orthopedic injuries. I took no explicit or implicit action to offer treatment advice or recommendations

or to create a patient-doctor relationship with this person (Patient C). There was no pre-existing professional relationship between me and this person either.

b.    After this conversation with Ms. Allen, I went back to sleep and was awakened by another page at around 7:30 PM. When I called back, Dr. Cohen at SJMC ED told me that my patient with tonsillar abscess from SCH had arrived. I informed her that I did not accept that patient because I did not have the physical capacity to safely and effectively take care of a peritonsillar abscess. It turned out that Defendant Moore, a board-certified emergency physician, accepted that patient for transfer. This is an undisputed finding of fact in MQAC's Final Order.

c.    Defendant Moore never contacted me or Ms. Allen to find out the reasons for my refusal to accept that patient. When I called her about this patient, she confirmed that she accepted the patient for transfer. I advised Dr. Moore to care for this patient since she is a board-certified emergency physician.  Alternatively, she could contact the FHS ENT group, which was on call contemporaneously for Franciscan patients if she herself could not. I declined to be Dr. Moore's substitute because I was not physically capable to drain an abscess at the time.

d.    Defendant Moore, a board-certified emergency medicine physician, was trained and experienced in needle aspirations, including needle aspiration of tonsillar abscesses. She accepted Patient C for transfer and owed a duty to care for him at SJMC. However, she declined to do so. Patient C was ultimately transferred to Madigan Medical Center and treated successfully there without any complications.

32.    Defendant Moore accepted that patient with the intent to interfere with my right to make and enforce my employment contract with GHP. She knew of our long-standing

agreement that all transfer requests had to be through the Franciscan Patient Placement

Center and had to be accepted when appropriate by the on-call GHP otolaryngologist.

33.    Because of this incident in ¶31, Defendants Clark and Moore acting as complainants on

June 16th, 2014 self-reported a "potential EMTALA violation" occurring on June 8th,

2014 to the CMS Division of Survey and Certification. Exhibit 1. These defendants'

motive was to retaliate against my refusal to accept "Patient C" and to discriminate

racially against me. They believed that I would be found in violation of EMTALA. They

had also hoped that a "self-report" would be viewed positively by the CMS investigator.

They also wanted to set an example out of me so that I and my GHP ENT partners would

stop pushing back on their demands to cover all the ED's within their expansive health

system for free.

34.    On June 17th, 2014, Defendant Moore emailed this self-reporting letter to my supervisors

at GHP, which was forwarded to me.

35.    On July 9th, 2014, CMS sent an investigator to SJMC to review the medical records and

conduct interviews with all involved parties. She interviewed me over the phone and took

no action against me regarding this self-reported "potential EMTALA violation."

36.    On July 17th, 2014, Defendants Adams and Moore in their role as executives of the FHS

summoned me for a meeting at the SJMC administration office because the CMS

investigator did not need to meet with me in person and did not take any administrative

action against me. At this meeting, I again told them that I only had an obligation

covering the ED at SJMC and not the entire FHS. They accused me of violating

EMTALA even though the CMS investigator took no action against me. They then

threatened me that they would take action against my medical staff membership if I

continued to be vocal about the on-call issues. They and the entire FHS administration

knew that my professional livelihood and employment contract with GHP would be in peril without my medical staff membership at SJMC.

37.     While CMS did not pursue any administrative action against me after its formal investigation, its investigator found that SJMC itself violated EMTALA. Specifically, according to the public announcement by the FHS Chief Medical Officer, Defendant Mark Adams, "St. Joseph Medical Center did not provide necessary stabilizing treatment for the patient, and did not have defined in the CHI Franciscan Health Medical Staff Bylaws who is qualified to perform a medical screening exam. CMS will revoke St. Joseph Medical Center's participation in the Medicare program unless the organization corrects these deficiencies." SJMC had to come up with a plan of corrective action to avoid sanction from CMS.

38.     Up to this day, CMS has taken *no* action against me in this matter. Because their plan of self-reporting "a *potential* EMTALA violation" backfired and placed their Medicare certification and participation at risk for future violation, the FHS administrative and executive leaders went on a witch hunt to retaliate against me for my vocal opinion about the FHS's inadequate and unsafe ENT coverage and quality of care issues solely on account of my race. They singled me out for racial discrimination and unwelcome harassment, creating a hostile work environment for me. On information and belief, my two GHP ENT partners refused consults from outlying hospitals but were not subjected to this kind of treatment because they are not Asians.

39.     Even after CMS ultimately concluded that it was FHS that violated EMTALA, Defendant Moore continued to engage in inappropriate patient transfers. She reportedly instructed the Franciscan Patient Placement Center in September 2014 to accept patient transfers from outlying FHS ED's to SJMC ED without discussing the cases with me. I threatened

to report another EMTALA violation to CMS. Because of the existing EMTALA violation in June, FHS was fearful of having their Medicare certification and participation revoked by CMS. Defendants Moore and Adams then set in motion their concerted efforts and actions with MQAC members and staff to violate my constitutional rights to free speech, due process, and equal protection under the law guaranteed by the US Constitution as well as my right to make and enforce employment contract per 42 U.S.C § 1981.

40.    On May 18th, 2015, a patient of Dr. Sorenson (an otolaryngologist employed by the Franciscan Ear, Nose & Throat Associates) presented with neck swelling after Dr. Sorenson removed a drain from her neck abscess. On information and belief, the ED physician at SJMC contacted Dr. Sorenson's service (Dr. Kennedy) and was told that "they were not on call for the ED." He then contacted me after 30 minutes of "multiple pages to Dr. Sorenson without response." I informed the ED physician that GHP ENT and FHS ENT groups did not cross-cover for each other's patients and advised him to contact the answering service for Dr. Sorenson to find out who was on call for Dr. Sorenson's patients. *See* ¶¶16-17. Realizing that Dr. Kennedy initially refused to take care of Dr. Sorenson's patient, I went out of my way to contact Dr. Sorenson's answering service and asked them to page Dr. Kennedy urgently since he was on call for Dr. Sorenson's patients. On information and belief, Dr. Kennedy finally called the ED at SJMC to take care of this patient. An incident report was filed on May 27th, 2015. The reviewer of this incident report determined "No deficiency of care" after having all the background information regarding this case. Nevertheless, the FHS administration conducted a sham peer review of my refusal to accept care of this patient even after their own otolaryngologist employee concluded "No deficiency of care." The sole reason for

this action was racial animus, discrimination, and harassment and retaliation with the ultimate intent to impair my medical license and employment contract as well as my freedom of speech and expression.

41.    On information and belief, Dr. Kennedy, who was on call for Dr. Sorenson but refused to take care of Dr. Sorenson's patient initially, was not subject to any peer review or administrative action by the FHS. Dr. Kennedy is white.

42.    Defendants FHS, Moore, and Adam never "self-reported" to CMS regarding this incident of potential EMTALA violation described in ¶40. Instead, they singled me out for a sham peer review with racial animus and a clear intent to interfere with my right to make and enforce my employment contract with GHP.

43.    After this sham peer review on August 15th, 2015, the FHS singled me out for more discrimination and forced me to sign an attestation promising that I would agree to "provide care for all patients who present to St Joseph Medical Center requiring emergency ENT services when [I am] on call regardless of the site of patient entry into CHI Franciscan Health and/or prior affiliation or treatment relationship." Exhibit 2. This was contrary to our previous agreement and the FHS Medical Staff Bylaws. I faced the threat of immediate revocation of my medical staff membership and ultimately the loss of my professional livelihood and employment. To protect my professional livelihood and employment with GHP, I had no option but to sign this attestation on September 28th, 2015 in order to maintain my medical staff membership at SJMC. Meanwhile, no other otolaryngologist with medical staff membership at SJMC had to sign such attestation. Racial animus, discrimination, and retaliation again were the sole reason for FHS coercing me to sign this attestation.

44.    I informed my employer all of these racial discriminatory actions and sham peer review by FHS, including this demand for Call Coverage Attestation Agreement. I was warned by my employer that my employment agreement would be terminated if I did not sign this attestation. Therefore, I was coerced into signing it to prevent being fired. Meanwhile, I tried to work out a separation agreement with my employer. I notified my partners at GHP ENT practice of my intention to resign from my post on September 27th, 2015 just before I had to sign the attestation. Neither of them was asked to sign such an attestation.

45.    When my attempt to negotiate a separation agreement with my employer GHP failed in October 2015, I continued to work and obey the demands of the Call Coverage Attestation Agreement. However, my work environment became increasingly more hostile and stressful. At times, I had to cancel half of my schedule at GHC clinic to attend to the FHS ED requests for "emergent ENT" service. Because of the Call Coverage Agreement, I basically had to promptly stop my scheduled clinical responsibilities at GHC to attend to all requests from FHS ED's or risk my medical staff membership being suspended and my professional livelihood ruined. I filed a complaint with the Equal Employment Opportunity Commission (EEOC) on May 31, 2016. I managed to last until the constructive termination of my employment agreement with GHP. I officially resigned from my position on August 1st, 2017 because of increasingly hostile work environment.

46.    The Call Coverage Attestation Agreement (Exhibit 2) materially altered the conditions of my employment. I was the only otolaryngologist who was coerced into signing this agreement in order to avoid termination of my medical staff membership and employment contract with GHP. The Medical Staff Bylaws only required on call

coverage for "*unassigned* patients" at the campus of my practice, which was SJMC. I was previously reassured of this requirement by multiple FHS administrative leaders and the Franciscan Ear, Nose and Throat Associates chief in writing. The FHS and its administrators singled me out for retaliation for my vocal objection to their abusive business practice and thus infringed upon my right to make and enforce the employment contract with GHP.

47. Furthermore, the FHS administrators pressured GHP administrators to remove me from my position as the Chief of the Tacoma GHP Otolaryngology group because of these long-standing community call issues not addressed by the FHS. I was the subject of multiple meetings with GHP management in June and August of 2015 when the main subject was my vocal opinion about the community call issues with the FHS. Defendants Moore, Adam, and FHS interfered with my right to make and enforce my employment contract with GHP.

48. With the Call Coverage Attestation Agreement in effect, I had to tread carefully whenever I was on call for SJMC. On multiple occasions, I had to cancel part of my clinic days to take care of all requests for ENT consult because I would not dare to question the appropriateness of such requests. I had to endure many nights of disrupted sleep to take calls from all FHS Emergency Departments for fear of having my medical staff membership suspended or revoked by the FHS. As a result, I had to take more sick days in 2015 than ever before.

49. To this day, CMS and the US Department of Health and Human Services (DHHS) never took any administrative action against me for any alleged EMTALA violation.

50. EMTALA is a non-discrimination federal statute, making emergency care available to everyone regardless their ability to pay. The statute imposes a legal obligation on

*hospitals* that participate in Medicare and operate an emergency department to provide appropriate medical screening and stabilization care to persons presenting themselves to the emergency room with an emergency medical condition or in active labor. Violations of EMTALA may result in monetary penalties of not more than $50,000 (or not more than $25,000 for hospitals with less than 100 beds) for each violation. Administrative enforcement of EMTALA and adjudication of a claim of potential EMTALA violation must follow the provisions of 42 U.S.C. § 1320a–7a, which plainly establishes the exclusive subject matter jurisdiction within the US Department of Health and Human Services. EMTALA does not establish a national standard of care. Neither is the statute a remedy for federal malpractice actions against physicians. Also, the statute does not define an EMTALA violation as unprofessional conduct.

51. This "self-reporting" letter from Defendants Clark and Moore eventually was forwarded to the Washington State Medical Quality Assurance Commission (MQAC). Their motive was to retaliate against me on account of my race and for my verbal refusal to accept inappropriate transfers from other hospitals of their health system and for my vocal opposition to their unfair and abusive business practice. They set in motion a "meeting of the minds" and concerted action with MQAC members and staff to tarnish my professional standing and medical license as well as to deprive me of the constitutional rights to free speech, due process, equal protection under the law, and privacy against arbitrary invasions by governmental officials guaranteed by the US Constitution and my right to make and enforce contract, 42 U.S. Code § 1981.

52. Defendant Timothy H Slavin, an investigator from MQAC, contacted Defendant Clark for more information.

53. On July 17, 2014, Defendant Clark on behalf of the FHS administration went on a witch hunt to find four (4) other cases from 2011 to 2013. All of these cases were from the ED's of outlying hospitals of the FHS where I did not apply for medical staff membership and admitting privilege or agree to provide on-call coverage. Just like "Patient C," none of these patients had an existing patient-doctor relationship with me. While these FHS defendants never self-reported these cases to CMS as possible EMTALA violations, Defendant Clark reported them to Defendant Slavin as such with the illegitimate motive of retaliating and racially discriminating against me. Knowing that my medical license is my professional and employment livelihood, these FHS defendants conspired with MQAC members and staff to violate my right to "make and enforce" my employment contract, which did not include the unfair and unreasonable demands to cover for all ED's within their expansive health system free of charge. 42 U.S. Code § 1981. These FHS defendants set in motion a series of concerted acts by MQAC officials and staff, which they knew would cause injury to my medical license and ability to obtain employment as well as my constitutional right to free expression of my opinion about the appropriateness of these requests for patient transfers. On information and belief, they conspired with MQAC members and staff to silence my vocal opposition to their demand for free coverage for every single ED of their expansive health system and to submit to their unreasonable and unfair demands. The sole reason is racial animus, discrimination, and harassment.

54. Because the FHS and MQAC defendants did not like the communicative content and viewpoint of my "refusal" to accept inappropriate requests for patient transfers and my verbal and written objection to FHS demand to provide free coverage for every ED, they conspired to censor and stifle my First Amendment right.

55.    Defendant Slavin reportedly sent me two letters requesting my written response to the allegation of a possible EMTALA violation on August 11th, 2014 and again on August 25th, 2014. Absent in these letters advising me of his "preliminary investigation" were important statements mandated by the Uniform Procedural Rules of the Uniform Disciplinary Act RCW 18.130.095(2)(a) (emphasis added).

> (2) The uniform procedures for conducting investigations shall provide that **prior to taking a written statement**:
> (a) For violation of this chapter, the investigator shall inform such person, in writing of: (i) The nature of the complaint; (ii) that **the person may consult with legal counsel at his or her expense prior to making a statement**; and (iii) that **any statement that the person makes may be used in an adjudicative proceeding** conducted under this chapter.

This violation of RCW 18.130.095(2)(a) is also a violation of my constitutional rights to due process and equal protection of the laws guaranteed by the Fifth and Fourteenth Amendments.

56.    In a rush to meet Defendant Slavin's deadline (3 days from August 25th, 2014), I responded on September 2nd, 2014 and denied breaking any rule or law without consulting my attorney and without knowing that "any statement that the person makes may be used in an adjudicative proceeding."

57.    On information and belief, Defendant Brueggemann[1] was assigned as the Reviewing Commissioner Member (RCM) on September 17, 2014. He is an emergency physician and knew that EMTALA is a federal statute, which specifies clearly and explicitly that claims of "potential EMTALA violation" must be investigated and adjudicated pursuant

---

[1] "Governor Inslee appointed Dr. William 'Marty' Brueggemann, Jr. to the Medical Commission in November 2013, representing the Fourth Congressional District. Dr. Brueggemann is a graduate of Western Washington University where he earned a B.S. in Human Biology, and the Medical College of Wisconsin. He is board certified in Emergency Medicine, and has worked at Yakima Valley Memorial Hospital for almost a decade."

Medical Quality Assurance Commission Update Vol. 4, Spring 2014. Available at https://www.doh.wa.gov/Portals/1/Documents/3000/658-002(March2014).pdf

to 42 U.S.C. § 1320a–7a. He and MQAC members knew or should have known that MQAC does not have subject matter jurisdiction over such claims. Yet, they continued to act with clear absence of EMTALA subject matter jurisdiction. On information and belief, as a practicing emergency physician from a small city in Yakima County, Defendant Brueggemann faced numerous refusals for transfers and thus used this case and his power as a MQAC member to set an example.

58.  On information and belief, my case was presented to a MQAC panel on October 3rd, 2014 when it authorized to "expand investigation." The investigation appeared to continue until early November 2014. By this time CMS had already completed its timely investigation and actually found that "St. Joseph Medical Center did not provide necessary stabilizing treatment for the patient, and did not have defined in the CHI Franciscan Health Medical Staff Bylaws who is qualified to perform a medical screening exam. CMS will revoke St. Joseph Medical Center's participation in the Medicare program unless the organization corrects these deficiencies." I was never a subject for further investigation and administrative proceeding by CMS. MQAC knew or should have known this information and thus should have stopped its unreasonable investigation for lack of probable cause. Still, MQAC members continued their witch hunt and pursued this allegation of a "potential EMTALA violation" to further the common goal of violating my First Amendment right to free expression.

59.  On information and belief, my two ENT colleagues at GHP refused inappropriate transfers from outlying FHS just like I did but faced no such action by the FHS administrators or MQAC members. But for my race, I would not have been subjected to such unreasonable prosecution, unwelcome harassment, and intentional discrimination.

60.     On information and belief, MQAC voted to issue Statement of Allegations and

Stipulation to Informal Disposition (STID) on or around November 20th, 2014 even

though MQAC clearly lacks EMTALA subject matter jurisdiction to independently

adjudicate the claim of "a potential EMTALA violation." Yet, I did not hear back from

MQAC until May 1st, 2015 when I was served its Statement of Allegations and Summary

of Evidence as well as its Stipulation to Informal Disposition (STID). This is a violation

of WAC 246-14-090 and a violation of my right to due process and equal protection.

61.     According to WAC 246-16-020(5), ""Patient" or "client" means an individual who

receives health care from a health care provider." However, neither person "A", "B", nor

"C" in the STID and subsequently the Statement of Charges, Final Order, and *amended*

Final Order had ever received any health care from me to be considered my "patient."

Therefore, I never owed them any duty of care or obligation to accept their transfers from

outlying hospitals where I had no medical staff membership or admitting privileges.

These allegations, charges, and subsequently conclusions of law that I violated the

standard of care are baseless and conclusory and violated my constitutional rights to free

speech, due process, privacy against intrusions by MQAC officials, and equal protection

under the law guaranteed by the US Constitution.

62.     On June 22nd, 2015, Drs. Ken Deem and Alex Moreano, my practice partners from the

GHP Otolaryngology group, attested to the existence of an ongoing issue with on-call

coverage for SJMC and FHS. Exhibit 3. Dr. Moreano attested under penalty of perjury, "I

have, in the past, taken the position that I was not required to consult on patients from

outlying FHS campuses while on community call. In part because of FHS' treatment of

Dr. Dang in this matter, I no longer take that position and consult on all FHS patients

during my community call." Exhibit 3. On information and belief, every GHP ENT

physician decided to stop taking calls and refuse consults from ED's of other outlying FHS hospitals. We only stopped the refusals after the self-report of "a potential EMTALA violation" by the FHS defendants because the FHS administration singled me out for retaliation. Nevertheless, on account of my race, both the FHS defendants and MQAC officials singled me out for discriminatory actions, harassment, retaliation, and prosecution for my speech and opinion. My two practice partners who are not of the Asian race did not have to endure such treatment.

63. On July 14th, 2015, my attorney requested a settlement conference with the reviewing commission member (RCM), Defendant Brueggemann. On July 15th, 2015, the Commission's staff attorney, Defendant Glein, denied this request because "The RCM's time is very valuable and I will not interrupt him unless I can present him some kind of written counteroffer from Dr. Dang." This is a violation of RCW 18.130.098(3), which is also violation of my constitutional rights to due process and equal protection of the laws guaranteed by the Fifth and Fourteenth Amendments.

64. Subsequently, MQAC issued its Statement of Charges on March 30th, 2016.

65. On June 15th, 2016, my attorney served the Answer to Corrected Statement of Charges and requested an adjudicative proceeding.

66. On June 24th, 2016, the Scheduling Order, Notice of Status Conference and Protective Order was served. This is when the adjudicative proceeding commences officially according to RCW 34.05.413(5). Then on July 11th, 2016, the Scheduling Order, Notice of Hearing was served to set the hearing date for January 30 – February 1, 2017.

67. It was not until October 6th, 2016 that MQAC granted me a settlement conference. In addition to the RCM, Defendant Brueggemann, attorneys Rick Glein and Debra Defreyn were also attending. These defendants interrogated me in person for the first time. I

answered all of their questions and explained to them the reasons for my verbal refusal to

consult and accept these inappropriate transfer requests. During this conference, I insisted

that I was never found to have violated EMTALA by any *federal* administrative agency

with the competency and jurisdictional authority to adjudicate this complaint of "a

potential EMTALA violation." I also have never been a party of any lawsuit, judgment,

or settlement involving medical negligence or malpractice to this day. My refusals were

purely my expression of a professional opinion to members of the public in the absence

of any patient-physician relationship and cannot be construed to be unprofessional

conduct prohibited by RCW 18.130.180. I strongly urged MQAC to drop these charges.

My professional opinion in the absence of a doctor-patient relationship was clearly pure

speech protected by the First Amendment to the US Constitution.

68.     After this settlement conference. MQAC proposed its Stipulated Findings of Fact,

Conclusions of Law, and Agreed Order. Its conclusions of law did not include violations

of RCW 18.130.180(7) and EMTALA 42 U.S.C. § 1395dd(d)(1)(B). By eliminating

these charges, these MQAC officials knew that they did not have EMTALA subject

matter jurisdiction to adjudicate a claim of "*potential* EMTALA violation" but went

ahead with their adjudicative proceeding with clear absence of EMTALA subject matter

jurisdiction. Without a formal adjudication of this "potential EMTALA violation" by the

US Department of Health and Human Services as prescribed by 42 U.S.C. § 1320a–7a,

MQAC did not have "the clear and convincing evidence" of an EMTALA violation.

MQAC does not have the statutory authority to manufacture an EMTALA violation after

CMS had declined to pursue an administrative action against me. By proceeding to

adjudicate this "*potential* EMTALA violation" claim, these state officials acting under

the color of state law and without EMTALA subject matter jurisdiction violated my

constitutional right to due process and equal protection under the law.

69.     Furthermore, when MQAC reported its administrative proceeding and disciplinary action

against me to the National Practitioner Data Bank in October 2nd, 2017, it did not report

that I violated EMTALA because MQAC knew that EMTALA subject matter jurisdiction

is exclusively delegated to the US Department of Health and Human Services – the

Center for Medicare Services (CMS). Yet, in the "Clerk's Summary" of the Final Order,

MQAC stated that I violated EMTALA 42 U.S.C. § 1395dd(d)(1)(B) and not 42 U.S.C. §

1395dd(g).

70.     By the time of the settlement conference, MQAC knew or should have already known

that in July 2014 CMS did investigate this claim of "a potential EMTALA violation" by

the FHS defendants but chose not to pursue any charges or conduct an administrative

adjudication against me for this incident. As such, it was clearly understandable that

MQAC decided to drop the violations of RCW 18.130.180(7) and EMTALA 42 U.S.C. §

1395dd(d)(1)(B) from its proposed Agreed Order. However, MQAC defendants

continued to insist on charging me and proceeding with their administrative hearing

without reasonable cause. This is a clear violation of the Fourth Amendment which

protects individual privacy interests against unwarranted intrusions by government

officials even in administrative law. The basic purpose of the Fourth Amendment, which

is enforceable against the States through the Fourteenth Amendment, through its

prohibition of "unreasonable" searches and seizures is to safeguard the privacy and

security of individuals against arbitrary invasions by governmental officials. *Camara v.*

*Municipal Court*, 387 U.S. 523, 528 (1967). Additionally, my constitutional right to due

process and equal protection under the law dictates that a claim of "a potential EMTALA

violation" be investigated and adjudicated by either CMS or the Office of the Inspector General (OIG) of the US DHHS, the only two administrative agencies with the EMTALA subject matter jurisdiction to conduct an adjudicative proceeding against EMTALA violation to enforce it. 42 U.S.C. § 1320a–7a. MQAC violated my Fourth, Fifth and Fourteenth Amendment right by adjudicating this complaint of "a potential EMTALA violation" without clear EMTALA subject matter jurisdiction.

71. In Washington state, medical disciplinary proceeding is classified as quasi-criminal. The Washington Supreme Court imposed on MQAC the burden of clear and convincing standard of proof. *Nguyen v. State*, *Dep't of Health Med*. *Quality Assurance Comm'n*, 144 Wn.2d 516, 29 P.3d 689 (Wash. 2001). "It is not strictly adversary in nature." *Id* at 528. A "potential EMTALA violation" that has never been adjudicated by the federal agencies with EMTALA subject matter jurisdiction (CMS and the OIG of the US Department of Health and Human Services) per 42 U.S.C. § 1320a–7a hardly satisfied such clear and convincing burden of proof. Only an *actual* judgment from CMS or the OIG of the US DHHS can.

72. While it was legally sound that MQAC dropped the violations of RCW 18.130.180(7) and EMTALA 42 U.S.C. § 1395dd(d)(1)(B) from its proposed Agreed Order, I refused to accept this Agreed Order because I should not be punished and censored for what I said to the emergency room providers in the absence of an implicit or explicit doctor-physician relationship and a duty of care. I did not agree to take emergency calls for the ED's of any hospital in the FHS other than SJMC. My statement that I was not on call at St Clare Hospital was not only factual but also protected by the First Amendment of the Constitution. My "refusal" to accept these transfers from outlying hospitals based on my

1   professional opinion that they were not appropriate was purely my exercise of my

2   freedom of expression protected by the First Amendment.

3   73.    Throughout the entire process, MQAC never notified me of the applicable time periods

4          per WAC 246-14-120, which is also violation of my constitutional rights to due process

5          and equal protection of the laws guaranteed by the Fifth and Fourteenth Amendments.

6          This lack of notification also violated RCW 34.05.080(7).

7   74.    The administrative hearing lasted from January 30th, 2017 through February 1st, 2017.

8   75.    On the first day of the hearing, Defendant Moore, the complaining witness, testified

9          falsely under oath that she was not aware of an "ongoing discussion between the ENT

10         specialists and the Franciscans about the issue of community call" before her phone call

11         with me regarding "Patient C" on June 8th, 2017. She did so in a concerted effort and

12         "meeting of the minds" with MQAC staff and members to further their common

13         objective of retaliation against me for my verbal refusal to accept inappropriate transfers

14         of patients I had no professional relationship or duty of care, violating my freedom of

15         speech and expression.  In reality, she was the main FHS representative in talk with my

16         medical center physician in chief, Dr. Iriye, regarding the GHP ENT group's concerted

17         effort to refuse calls from outlying FHS Emergency Departments. She even proposed a

18         "screening checklist for the transfer center" in an email dated April 30, 2014.

19  76.    On the third day of the hearing, Defendant Dixon was asked to admit new evidence in the

20         form of four (4) strings of emails to challenge Defendant Moore's false testimony and

21         credibility as a witness. He ruled to exclude the new evidence, violating my due process

22         right to presenting evidence and having an unbiased tribunal.

23  77.    To conclude the proceeding on February 1st, 2017, Defendant Dixon announced that "we

24         try to get an order out within 45 to 90 days."

78.   On May 3rd, 2017 Defendant Dixon *untimely* issued and served a post-hearing order extending time to issue the final order to May 26th, 2017. This date of May 3rd, 2017 was itself more than 90 days from February 1st, 2017 and thus violative of RCW 34.05.461(8)(a) and my constitutional due process right. After this new deadline, MQAC remained silent and did not notify me of the reason for missing this new deadline. This is a gross violation well-established law, RCW 34.05.461(8)(a), RCW 34.05.080(7), and WAC 246-14-120 enacted to ensure my constitutional due process and equal protection under the law.

79.   It was not until October 2nd, 2017 that I was served with the Findings of Fact, Conclusions of Law, and Final Order (Final Order) signed on September 29th, 2017. MQAC never informed me of the reasons for this delay, violating RCW 34.05.080(7). This service of the final order was obviously much later than May 26, 2017 and thus again violative of RCW 34.05.461(8)(a) and my constitutional due process right.

80.   In the Final Order dated September 29th, 2017, MQAC found the following:

   a.   I was "employed by SJMC at all times relevant to this matter."
   b.   I did not violate the standard of care or EMTALA with regard to Patient A.
   c.   I did not violate EMTALA with regard to Patient B. However, my "refusal to consult with the emergency room doctor concerning the care of Patient B lowered the standard of the profession in the eyes of the public." My "refusal" created an unreasonable risk of harm to Patient B.
   d.   The Commission reached the legal conclusion with clear and convincing evidence that I violated RCW 18.130.180 (1), (4), and (7).
   e.   MQAC also concluded that I violated EMTALA with regard to Patient C even though it has no interpretative competency or subject matter jurisdiction on 42 U.S.C. § 1395dd(d)(1)(B). MQAC offered no evidence that either CMS or the OIG of the US DHHS had adjudicated this claim of "potential EMTALA violation" and then concluded that I violated EMTALA in accordance with 42 U.S.C. § 1320a–7a.
   f.   MQAC also offered no evidence that these persons "A", "B", and "C" received "health care from" me to meet the definition of "Patients" according to WAC 246-16-020(5). Neither did MQAC provide any evidence that I directly communicated and formed a doctor-patient relationship with these persons "A", "B", and "C" either explicitly or implicitly to create my duty of care to them. Yet, MQAC legally concluded that I practiced below the standard of care and committed "incompetence, negligence, or malpractice" because of my verbal "refusal to consult with fellow

physicians and treat patients." COL 2.6 and 2.12. MQAC offered no legal authority supporting its position that my verbal "refusal" is unprotected speech and removed from the First Amendment's ambit.

g.  MQAC also concluded, "the Respondent's refusal to aid and consult with fellow physicians, while acting as an on-call specialist, constitute [sic] acts of moral turpitude." COL 2.4. MQAC again offered no legal authority supporting its position that my verbal "refusal" is speech unprotected by the First Amendment.

h.  The Commission ordered that my medical license be subject to 2 years of oversight. I also was ordered to be monitored for good behavior, pay a $5,000 fine, appear before the Commission, take an ethics course, write a research paper, and satisfy other conditions.

81.   MQAC violated clearly established law protecting my freedom of speech and expression because the First Amendment means that MQAC has no power to restrict and punish my expression "because of its messages, its ideas, its subject matter or its content." *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 573 (2002).

82.   Footnote 23 of MQAC final order states, "At hearing, the Respondent testified that he did not refuse to consult or treat Patient B. Rather, he told the doctor calling on behalf of St. Francis to 'let me call you back when I get home, so I can look at information to see if this is an appropriate transfer.' The Panel was not persuaded by Respondent's testimony and deemed this act a refusal to consult." This action is clearly a content-based regulation of speech prohibited by the First Amendment.

83.   Footnote 28 of MQAC final order states, "At hearing, the Respondent testified that an injury suffered prior to being contacted about Patient C rendered him unavailable to treat Patient C, due to pain and having taken narcotic pain medication. The Panel was not persuaded by Respondent's after-the-fact justification." This is another textbook content-based restriction on speech because MQAC is regulating my speech based on its communicative content and my viewpoint.

84.   Because MQAC restricted what I can and cannot say as a licensed physician, it violated clearly established First Amendment right and created a "collision between the power of

1    government to license and regulate those who would pursue a profession or vocation and

2    the rights of freedom of speech and of the press guaranteed by the First Amendment."

3    *Lowe v. S.E.C.,* 472 U.S. 181, 228, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985) (White, J.,

4    concurring in the result).

5    85.   Conclusion of Law (COL) 2.8 in the Final Order stating, "[t]he Department proved by

6          clear and convincing evidence that the Respondent committed unprofessional conduct as

7          defined in EMTALA, 42 USC Sec. 1395dd(d)(1)(B)" is false and baseless because

8          EMTALA has absolutely *no* definition of an "unprofessional conduct" in its plain text.

9    86.   In the absence of any lawful adjudication and then judgment by CMS or the OIG from

10         the US DHHS that I violated EMTALA pursuant to 42 U.S.C. § 1320a–7a, COL 2.8

11         stating that "the Respondent violated EMTALA" was untruthful and conclusory. MQAC

12         thus violated my constitutional rights to due process and equal protection under the law

13         guaranteed by the US Constitution.

14   87.   On October 11th, 2017, Defendant Defreyn timely filed a petition for reconsideration to

15         correct two errors of facts in the Final Order. This petition was *not* disposed of "within

16         twenty days from the date the petition is filed" and was deemed "denied" thereafter

17         according to RCW 34.05.470(3).

18   88.   On October 30th, 2017, I timely filed my petition for judicial review of the Commission's

19         Final Order with the King County Superior Court case no. 17-2-28129-8 KNT, invoking

20         its appellate jurisdiction on this matter. This action also terminated and finalized the

21         administrative proceeding before MQAC. The Final Order became the final judgment by

22         MQAC. *Res judicata* attached to the Final Order.

23   89.   On November 2nd, 2017, defendant Dixon *untimely* issued and served another post-

24         hearing order setting a briefing schedule without granting or denying the Commission's

petition for reconsideration. This *untimely* action violated my constitutional due process right. The petition for reconsideration was deemed denied because defendant Dixon did not follow procedural due process mandated by RCW 34.05.470(3). Defendant Dixon acted without subject matter jurisdiction because the King County Superior's appellate jurisdiction was invoked by my petition for review on October 30th, 2017.

90.    Footnote number 2 of the Amended Final Order reads, "On November 1st, 2017, the Respondent filed his Petition for Judicial Review in King County Superior Court." This statement is grossly untruthful because my petition for judicial review was in fact filed on October 30th, 2017. Yet, defendant Dixon and Johnson willfully went on to amend its *Final* Order, violating RCW 34.05.470(3). These defendants knowingly and maliciously violated my procedural due process as well as my right to equal protection under the law guaranteed by the US Constitution.

91.    Suddenly on December 26, 2017, I received a new *amended* Final Order dated December 20th, 2017 and served on December 22, 2017. Through no fault of my own, my "sentence" had been extended from September 29th, 2017 to December 20th, 2017 because RCW 34.05.473(1) states, "Unless a later date is stated in an order or a stay is granted, an order is effective when entered." This action is a gross violation of my Fifth and Fourteenth Amendment right to due process and equal protection under the law. Defendants Dixon and Johnson, again acted outside of their jurisdictional authority and violated *res judicata* because this matter had been before the King County Superior Court since October 30th, 2017.

92.    On December 26th, 2017, the Washington Health Care Authority terminated my Washington State Medicaid Contract pursuant to WAC 182-502-0030 because of MQAC's action on my medical license. This serves no public interest because the

Washington State Medicaid population no longer has me as a competent and skilled surgeon to provide them with Ear, Nose, and Throat specialty services.

93. On June 1st, 2018, the Oklahoma State Board of Medical Licensure and Supervision (the Board) served me with the Verified Complaint because of the disciplinary action taken by MQAC. Subsequently, the Board issued its Citation charging me with violation of Okla. Admin. Code§ 435:10-7-4(31). On September 27th, 2018, the Board amended its Verified Complaint and Citation charging me with "violations of the Medical Practice Act at 59 O.S. § 509(9), (13); and Okla. Admin. Code§ 435:10-7-4, (31), (39)". A hearing was scheduled for May 9th, 2019. The Board then issued its Order for a Continuance and rescheduled my hearing for November 7th, 2019. I submitted my prehearing memorandum and raised issues of EMTALA subject matter jurisdiction and unsupported legal conclusions by MQAC for lack of a doctor-patient relationship and duty of care. The unbiased Board promptly dismissed the Complaint and Citation simply based on my prehearing pleading and legal memorandum and subsequently canceled the administrative hearing.

94. My Petition for Judicial Review came before the King County Superior Court on June 29, 2018. The judge issued her ruling and order on August 9th, 2018 and concluded, "However, the delay in the order has prejudiced the Petitioner by extending the period of time period he has been subject to sanctions or the possible imposition of sanctions. Although the Petitioner's license was not restricted during the pendency of the proceeding or order, a two-year period of monitoring that should have been completed as of May 26, 2019 had the order been timely issued, has been extended to September 29, 2019." As a result, she ordered, "The effective date of the Final Order shall be deemed to be May 26, 2017 and not September 29, 2017. Accordingly, Dr. Dang may petition the

Commission in writing to terminate the Final Order on or after May 26, 2019 if he has fully complied with all requirements of the Final Order." Recognizing that "The Presiding Officer's Post-Hearing Order No. 2: Order Setting Briefing Schedule on the Department's timely Petition for Reconsideration was signed one (1) day and served two (2) days beyond the required twenty (20) days required by WAC 246-11-580", the judge did not affirm the *Amended* Final Order, which was not the subject of my petition for judicial review.

95.    I timely filed my Notice of Appeal of the Superior Court's order to the Washington Court of Appeals Division I case no. 78910-4-I on September 5th, 2018.

96.    Defendants Defreyn and Pfluger, acting as defense attorneys, represented MQAC Defendants in the judicial review in the King County Superior Court and subsequently the Washington Court of Appeals Division I. In their private capacity, they conspired with MQAC and FHS defendants in furtherance of MQAC's violation of my rights guaranteed by the First, Fifth, Fourteenth Amendments, and my right to make and enforce contract secured by 42 U.S. Code § 1981. They defended MQAC defendants' violations of clearly established laws protecting my rights to free speech, due process, equal protection under the law. Through extensive briefings and review of the administrative records, they knew of the facts of the case and the violations of clearly established law including RCW 34.05 protecting my constitutional rights to fundamental fairness, due process, equal protection under the law, and free speech. Yet, they still defended and supported such clear violations of my civil rights. They defended MQAC's action in furtherance of the common goal of retaliating me for my speech and expression by asking for the *amended* final order to be affirmed.

97.   On August 19th, 2019, the Washington Court of Appeals Division I (COA) affirmed "the *amended* MQAC decision and final order."

98.   In fact, I never filed a petition for judicial review of the *Amended* Findings of Fact, Conclusions of Law, and Final Order. Yet, Defendants Defreyn and Pfluger and Johnson kept asking for this *amended* final order to be affirmed in their response brief dated March 5, 2019 in furtherance of MQAC's violation of my rights guaranteed by the First, Fifth, Fourteenth Amendments, and my right to make and enforce contract secured by 42 U.S. Code § 1981.

99.   I timely filed my petition for review of the COA's judgment with the Washington Supreme Court on November 21st, 2019. The Washington Supreme Court denied my petition for review on March 4, 2020 without a written opinion.

100.   My timely Petition for a Writ of Certiorari for judicial review to the US Supreme Court was denied on October 5th, 2020.

101.   MQAC has never scheduled any "personal appearance" as required by the Final Order so that I "may petition the Commission in writing to terminate the Final Order on or after May 26, 2019 if he has fully complied with all requirements of the Final Order." *See* the King County Superior Court order dated August 9th, 2018. This is a violation of my due process and equal protection right.

## V.   INJURIES

96.   As a direct or proximate result of the racial animus, discrimination, and harassment by FHS and its employees and officers, my employment contract with GHP had to be terminated due to increasingly hostile work environment.

97.   As a direct or proximate result of the unlawful disciplinary action by MQAC in violation of my constitutional rights to free speech, privacy, due process, and equal protection

1    under the law, I had to resign from my staff otolaryngologist position with GHP and have

2    not been able to obtain meaningful employment in my specialty.

3    98.    Although the Oklahoma Board of Medical Licensure and Supervision dismissed its

4    Verified Complaint and Citation, my medical license in Oklahoma State and professional

5    standing are forever blemished and tarnished because of MQAC Defendants' conduct.

6    99.    MQAC reported its disciplinary action against me and its "limitation or restriction" on

7    my Washington state medical license to the National Practitioner Data Bank (NPDB) for

8    an "indefinite" length of action. Exhibit 4. This report has constrained and will hinder my

9    ability to seek employment as a board-certified otolaryngologist.

10    100.    The Washington Health Care Authority (Washington State Medicaid) terminated my

11    contract and participation in Medicaid program on December 26th, 2017 for an "indefinite

12    length of action" because of MQAC's action on my medical license. Exhibit 4.

13    101.    I sustained severe emotional distress as a direct and proximate result of the Defendants'

14    conduct and the subsequent injuries described in the previous paragraphs. Additionally, I

15    faced humiliation, shame, and inconvenience when addressing inquiries of MQAC

16    disciplinary action by the American Board of Otolaryngology.

17    **VI.    CAUSE OF ACTION**

18    102.    For each of the following causes of action, Plaintiff repeats and re-incorporates the facts

19    and allegations set forth in ¶¶ 1 through 101, inclusive, as though fully set forth herein.

20    FIRST CAUSE OF ACTION -- VIOLATION OF 42 U.S.C. §1983

21    103.    Defendants Johnson, Brueggemann, Glein, Dixon, Defreyn, Pfluger, and Slavin, acting

22    under color of state law, the Uniform Disciplinary Act RCW 18.130, deprived Plaintiff of

23    rights secured by the Constitutional First, Fourth, Fifth, and Fourteenth Amendments and

24    federal statute 42 U.S.C. §1981 as well as Washington Administrative Procedure Act

RCW 34.05. The Defendants adjudicated a claim of "a potential EMTALA violation" without clear subject matter jurisdiction pursuant to 42 U.S.C. § 1320a-7a, violating my clearly established rights to due process, equal protection under the law, and privacy against intrusions by MQAC officials. The Defendants also censored my speech and expression of my opinion in the absence of a professional relationship with persons "A", "B", and "C", violating clearly established right to free speech and expression. Throughout the administrative proceeding, the Defendants violated multiple procedures and statutory time limits set forth in the Washington Administrative Procedure Act RCW 34.05 and Uniform Disciplinary Act RCW 18.130, depriving me of my constitutional rights to due process and equal protection under the law and not to be prosecuted maliciously without probable cause.

104.    Defendants Moore, Adams, Clark, Patel, and Franciscan Health System (respondeat superior) conspired with Defendants named in ¶103 and thus acted under color of state law and in concert with state officials with the common objective of depriving Plaintiff of clearly established rights as described in ¶103.

105.    As a result of Defendants' violation of the First, Fourth, Fifth, and Fourteenth Amendments to the US Constitution as described in ¶¶103 - 104, Plaintiff suffered from grave injuries in his property, contract, and professional standings as described in ¶¶96 – 101 of this complaint. Plaintiff, a board-certified otolaryngologist head and neck surgeon, has been denied employment opportunities providing substantial compensation and benefits, thereby entitling Plaintiff to injunctive and equitable monetary relief. Plaintiff has also suffered anguish, grief, humiliation, distress, inconvenience, and loss of enjoyment of life because of Defendants' actions, thereby entitling Plaintiff to

1    compensatory damages. Most importantly, Plaintiff suffered from loss of liberty from the

2    civil rights violation by these Defendants.

3    106.   In their discriminatory conduct and actions as alleged above, Defendants named in ¶¶103

4    and 104 have acted with malice and reckless indifference to the rights of Plaintiff,

5    thereby entitling Plaintiff to an award of punitive damages.

6    107.   To remedy the violations of the rights of Plaintiff secured by the First, Fourth, Fifth, and

7    Fourteenth Amendments of the US Constitution and Section 1981 of 42 U.S. Code,

8    Plaintiff requests that the Court award me the relief prayed for below.

9    108.   Present and actual justiciable controversies exist between Plaintiff and Defendants

10    concerning their rights and respective duties. Plaintiff contends that (1) MQAC lacks

11    EMTALA subject matter jurisdiction to independently adjudicate the underlying claim of

12    a "potential EMTALA violation" (Exhibit 1) for negligently violating 42 U.S.C. §

13    1395dd(d)(1)(B) pursuant to 42 U.S.C. § 1320a–7a; (2) Defendants violated Plaintiff's

14    Fourth Amendment right to privacy against intrusions by MQAC officials because they

15    acted without probable cause or evidence that I was found guilty of an EMTALA

16    violation by a competent federal administrative agency with EMTALA subject matter

17    jurisdiction; (3) Defendants violated my Fifth and Fourteenth Amendment rights to due

18    process and equal protection under the law as alleged in ¶¶49, 55, 58, 63, 69, 70, 71, 73,

19    76-79, 86-91 and 101; (4) Defendants violated my First Amendment right as alleged in

20    ¶¶54, 67, 72, 75, 80-84. Viewpoint discrimination is an "egregious form of content

21    discrimination" and is "presumptively unconstitutional." *Rosenberger v. Rector and*

22    *Visitors of Univ. of Va.,* 515 U.S. 819, 829-830, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).

23    109.   Plaintiff is informed and believes and thereon alleges that the Defendants deny these

24    allegations. Declaratory relief is therefore necessary and appropriate.

110.    No plain, adequate, or complete remedy at law is available to Plaintiff to redress the wrongs addressed herein.

111.    If this Court does not grant the declaratory and injunctive relief sought herein, Plaintiff will be irreparably harmed.

<u>SECOND CAUSE OF ACTION -- VIOLATION OF 42 U.S.C. §1981</u>

112.    The racial animus, discrimination, and harassment by Defendants Moore, Adams, Clark, Patel, and Franciscan Health System (respondeat superior) impaired the Plaintiff's right to "make and enforce" my employment contract with GHP violating the Civil Rights Act 1866, 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991.

113.    By their conduct described above, Defendants named in ¶112 racially discriminated and harassed Plaintiff to create a hostile work environment leading to Plaintiff's constructive discharge. As such, Defendants intentionally deprived Plaintiff of the same rights as are enjoyed by white citizens to the creation, performance, enjoyment, and all benefits and privileges, of Plaintiff's contractual employment relationship with GHP in violation of 42 U.S.C. §1981. They used the disciplinary process of MQAC to further their goal of impairing my right to make and enforce my employment contract with GHP in retaliation against me after CMS found FHS in violation of EMTALA and in retaliation against me for my free expression of opinion.

114.    As a result of Defendants' violation of 42 U.S.C. §1981 as described in ¶¶112 – 113, Plaintiff suffered from grave injury to his medical license, professional standing and reputation, and professional livelihood as described in ¶¶96 – 101 of this complaint. Plaintiff also has been denied employment opportunities with substantial compensation and benefits as a board-certified otolaryngologist head and neck surgeon, thereby entitling Plaintiff to injunctive and equitable monetary relief. Plaintiff has also suffered

anguish, humiliation, distress, inconvenience and loss of enjoyment of life because of Defendants' actions, thereby entitling them to compensatory damages.

115.    In their discriminatory conduct and actions as alleged above, Defendants named in ¶112 have acted with malice and reckless indifference to the rights of Plaintiffs, thereby entitling Plaintiff to an award of punitive damages.

116.    To remedy the violations of the rights of Plaintiff secured by 42 U.S.C. § 1981 to make and enforce employment contract, Plaintiff requests that the Court award me the relief prayed for below.

<u>THIRD CAUSE OF ACTION -- VIOLATION OF 42 U.S.C. §1985(3)</u>

117.    In their private capacity and on account of race, Defendants named in ¶112 conspired with Defendants named in ¶103 using the MQAC disciplinary process to advance a series of actions against Plaintiff designed to improperly stifle my speech and deprive Plaintiff of due process, equal protection under the law, and privacy against intrusions by MQAC officials guaranteed by the US Constitution as well as the right to make and enforce contracts according to 42 U.S.C. § 1981.

118.    Because of Defendants' conduct described above, Plaintiff suffered from grave injuries in his property contracts, and professional standings as described in ¶¶96 – 101 of this complaint. Plaintiff also has been denied employment opportunities with substantial compensation and benefits as a board-certified otolaryngologist head and neck surgeon, thereby entitling Plaintiff to injunctive and equitable monetary relief. Plaintiff has also suffered anguish, humiliation, distress, inconvenience and loss of enjoyment of life because of Defendants' actions, thereby entitling them to compensatory damages.

119.    In their discriminatory conduct and actions as alleged above, Defendants named in ¶112 and ¶103 have acted with malice and reckless indifference to the rights of Plaintiffs, thereby entitling Plaintiff to an award of punitive damages.

120.    To remedy the violations of the rights of Plaintiff secured by 42 U.S.C. § 1981 to make and enforce employment contract, Plaintiff requests that the Court award me the relief prayed for below.

FOURTH CAUSE OF ACTION -- VIOLATION OF WASHINGTON STATE CONSTITUTION, CIVIL RIGHTS ACT RCW 49.60.030, ADMINISTRATIVE PROCEDURE ACT RCW 34.05, AND CONSUMER PROTECTION ACT RCW 19.86

121.    Defendants named in ¶112 acted in concert with Defendants named in ¶103 to improperly (1) stifle Plaintiff's speech and expression in violation of the Washington State Constitution Article I Section 5, (2) deprive Plaintiff of due process and civil rights in violation of the Washington State Constitution Article I Section 3, Washington Administrative Procedure Act RCW34.05, and Uniform Disciplinary Act RCW 18.130, and (3) to make and enforce contracts in violation of Washington State Civil Rights Act RCW 49.60.030.

122.    By Defendants' conduct described above, Plaintiff suffered from grave injuries in his property, contracts, and professional standings as described in ¶¶96 – 101 of this complaint. Plaintiff also has been denied employment opportunities with substantial compensation and benefits as a board-certified otolaryngologist head and neck surgeon, thereby entitling Plaintiff to injunctive and equitable monetary relief. Plaintiff has also suffered anguish, humiliation, distress, inconvenience and loss of enjoyment of life because of Defendants' actions, thereby entitling them to compensatory damages.

123.    To remedy the violations of the rights of Plaintiff secured by the Washington State

Constitution and laws as described in ¶121, Plaintiff requests that the Court award

Plaintiff the relief prayed for below.

### VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court grant relief on the First, Second, Third and

Fourth Causes of Action as specified below.

1.    Plaintiff prays that the Court assign the case for hearing(s) at the earliest practicable

date(s) and cause the case to be in every way expedited.

2.    Plaintiff seeks a judicial declaration of the rights and duties of the respective parties.

3.    Plaintiff prays that the Court issue a declaratory judgment against Defendants named in

¶¶103 and 112, finding that the Defendants have violated the rights of Plaintiff secured

by the First, Fourth, Fifth, and Fourteenth Amendments to the US Constitution.

4.    Plaintiff also prays that the Court issue a declaratory judgment against Defendants named

in ¶¶112 and 103, finding that the Defendants have violated the right of Plaintiff to make

and enforce contracts secured by 42 U.S.C. §1981.

5.    Plaintiff prays that the Court issue a preliminary and permanent injunction pursuant to 42

U.S.C. § 1983, §1981, and §1985(3), enjoining Defendants, members of MQAC from

enforcing their Final Order because it is unconstitutional for violating the First, Fourth,

Fifth, and Fourteenth Amendments of the US Constitution.

6.    Plaintiff prays that the Court enter a preliminary and permanent injunction ordering and

requiring that Defendants FHS and MQAC members and staff formulate, institute, adopt

and maintain policies and practices which will promote equal, fair, and nondiscriminatory

treatment of Plaintiff and future Asian Americans, and minority groups, and which will to

the extent practicable remedy the continuing effects of past discrimination against Plaintiff and other racial minority groups.

7.    Plaintiffs pray that the Court award monetary relief as follows:

    a.    Equitable monetary relief, compensatory and punitive damages to Plaintiff in an amount to be proved at trial;

    b.    Costs, expenses, and attorneys' fees incurred in bringing this action by determining Plaintiff the prevailing party;

    c.    Costs, expenses, and attorneys' fees incurred for the administrative proceeding before MQAC, all petitions for judicial review of MQAC Final Order, compliance of MQAC Final Order;

    d.    Lost wages, including lost fringe benefits, past, present and future;

    e.    Loss of professional reputation and prestige;

    f.    Emotional distress damages;

    g.    Loss of liberty from the civil rights violations;

    h.    Such other and different damages as may be identified through discovery and/or at trial;

    i.    Pre- and post-judgment interest in all monetary amounts awarded in this action, as provided by law.

8.    Plaintiffs pray that the Court retain jurisdiction of this case for a sufficient period of time to assure that Defendants have fully complied with the preliminary and permanent injunctions requested herein and has remedied to the greatest extent practicable the discriminatory policies and practices complained of herein.

9.    Plaintiffs pray that the Court award such other and further relief as this Court deems equitable and just.

## VIII.   CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:          July 27, 2021

Signature of Plaintiff

Printed Name of Plaintiff     HUNG DANG, M.D.